# DAVID GORDON

ATTORNEY AT LAW
40 Fulton Street, 17th Floor
NEW YORK, NEW YORK 10038
TEL: (212) 772-6625
FAX: (914) 725-3229

October 14, 2021

By ECF

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Albert Masterjoseph*,
              Criminal Docket No. 19-442-10 (S-1) (BMC)

Dear Judge Cogan:

The defendant Albert Masterjoseph respectfully requests that your Honor consider this letter as Mr. Masterjoseph's Sentencing Memorandum.  Mr. Masterjoseph is scheduled to be sentenced by your Honor on Thursday, November 4, 2021.  He was arrested on October 3, 2019, on the instant offense, was released on an $100,000 personal recognizance bond. He has been fully compliant with all the conditions of his release.  On July 12, 2018, he pleaded guilty to Count 27 of the superseding indictment, admitting also to the allegations contained in Count 22, and stipulating the guidelines would also be based upon that as well.

Objections to the Presentence Investigation Report ["PSR"]

Mr. Masterjoseph objects to the allegations in the Presentence Investigation Report ["PSR"] that he was an associate of the Colombo organized crime family.  PSR ¶¶ 19, 80.[1] According to the PSR, associates are individuals . . . who are not members of the crime family, but who . . . engage in criminal activity for, and under the protection of, the crime

---

[1]The PSR is used by the Bureau of Prisons for inmate designation, initial and subsequent security classification, freedom within the institution once assigned, institutional programs, furloughs, and release planning.  Even if a non-custodial sentence is imposed, the United States Probation Department uses the PSR in establishing a supervision regimen. Accordingly, any misinformation in the PSR must be corrected at sentencing.

family.  PSR ¶ 12.     The defendant Thomas Scorcia, a loanshark who used extortionate means to collect debts and intimidate rivals, had become a made member of the Colombo crime family in December 2018.  Mr. Masterjoseph accompanied Scorcia on three occasions in early 2019 in connection with Scorcia's attempts to intimidate two individuals. He participated only because he was heavily in debt to Scorcia.[2] The government acknowledged that Mr. Masterjoseph had no vested interest in Scorcia's debt collection or intimidation. *See* PSR ¶ 83.   Mr. Masterjoseph exercised no authority over the other defendants or over anyone.  However, contrary to the PSR's claim, that he had *little* discretion beyond his instant involvement, *see* PSR ¶ 83,  he had absolutely no discretion at all.  There is no evidence to suggest that Mr. Masterjoseph was an associate of the Colombo crime family, i.e., that he acted for, or under the protection of, the crime family.[3]

Mr. Masterjoseph objects to ¶¶ 115 and 168 of the PSR, and moves that they be stricken from the PSR.   The plea agreement does not contain a stipulation that Mr. Masterjoseph was involved in the operation of an illegal sports-betting business from September 2018 to October 2019, or during any other time period.  It provides in paragraph 5 only the following:

> "no further criminal charges will be brought against the defendant for his role
> in operating an illegal sports-betting business between September 2018 and

---

[2]Thus, in addition to not being included in the list of associates of the Colombo crime family in PSR ¶¶ 19, 80, Mr. Masterjoseph should be added to the list of Scorcia's loansharking debtor victims,  in PSR ¶ 21.  Were he not indebted to Scorcia, he never would have participated in Scorcia's criminal conduct.

[3]The Court struck this same allegation from the PSR of Krenar Suka at Suka's sentencing. *See* Page 8 of Sentencing Transcript attached to Judgment for Krenar Suka, Docket Entry 504-2. This, despite the fact that Suka pleaded guilty to participating in the attempt to intimidate John Doe #10 [Dominick Ricigliano], and the government's claim that Suka had been aligned with Ricigliano [a co-defendant who also engaged in loansharking] prior to aligning with Scorcia or trying to align with Scorcia, that Suka tried to collect money from the brother of one of Scorcia's loansharking victims, and that Suka believed that he and Scorcia would continue to assist each other in collecting loansharking debts owed to either of them.  *See* Government's Sentencing Memorandum for Defendant Krenar Suka, at 5-6, Docket Entry 458.  The government had a much more compelling argument that Suka was an associate of the Colombo organized crime family than that Mr. Masterjoseph was one.

Honorable Brian M. Cogan
October 14, 2021
Page 3

October 2019 (as charged in Count 9)[4] . . . and that at the time of sentence it
[the government] will move to dismiss the remaining counts of the Indictment
and any underlying indictments with prejudice."

We agree with the guideline calculation contained in the plea agreement and the PSR, which includes a 2-level minor role adjustment,[5] except that the PSR fails to reduce the offense level one level for the global resolution, as stipulated by the parties in paragraphs 2 and 7 of the plea agreement. Thus, the Total Offense Level is 16, not 17 (*see* PSR, ¶¶ 109, 152), and the guideline imprisonment range is 21 to 27 months, not 24 to 30 months *(see* PSR ¶ 152), as Mr. Masterjoseph (having zero criminal history points as he has no prior arrests, much less any convictions) is in Criminal History Category I. *See* PSR ¶¶ 110-113, 116-117, 152.

However, for the reasons set forth below we respectfully submit that, due to Mr. Masterjoseph's age, his previously unblemished record, the mitigating circumstances surrounding his participation in the offense, his full acceptance of responsibility and sincere remorse, the punishment he has already received as a result of this conviction (his inability after 30 years working as a court stenographer to continue such employment), the likelihood that he has CTE (chronic traumatic encephalopathy) and in the perhaps not too distant future he will suffer from dementia, and the strong unlikelihood that he will commit any crimes in the future, a sentence of probation (or "time served" followed by a term of supervised release), would be sufficient to achieve the goals of sentencing spelled out in 18 U.S.C. § 3553(a)(2), and that a sentence within the applicable guideline range, or for that matter any custodial sentence, would be considerably greater than necessary to achieve those goals.

Offense Conduct - Mitigating Circumstances

Mr. Masterjoseph met Scorcia through his girlfriend at the time, Kathy Benfonte, who was Scorcia's wife's sister. Mr. Masterjoseph lived with Ms. Benfonte from November 2011 to the spring of 2014. He saw Scorcia a few times when attending his girlfriend's family's barbeques. He and Scorcia had no other social relationship or contact, and Mr. Masterjoseph

---

[4]Count Nine alleges that the approximate time period of alleged illegal sports-betting was between September 2018 and February 2019, not October 2019.

[5]Although a non-frivolous argument could be made that Mr. Masterjoseph should receive a 4-level minimal role adjustment, he has stipulated in the plea agreement to a 2-level minor role adjustment, and is not arguing for a 4-level minimal role adjustment.

had no relationship at all with any of the other defendants in this case.  Mr. Masterjoseph, aware of Scorcia's loan-sharking activities, borrowed $25,000 from Scorcia in 2017 to help pay for his daughter Rose's wedding, understanding the consequences if he failed to pay the weekly interest on the loan.  Mr. Masterjoseph paid interest weekly, but was never able to repay the loan.

When Scorcia asked him to "go for a ride" in February and April, 2019, Mr. Masterjoseph understood that he was being asked to accompany him because of his threatening physical appearance, in order to frighten whoever Scorcia planned to meet.[6] Scorcia assured him, however, that he would not be asked to engage in any violent activity. Mr. Masterjoseph felt indebted, and was indebted, to Scorcia because the money he had received from Scarcia enabled his daughter to have the wedding she had dreamed of. Although he knew that it was wrong to participate, he went along because of his indebtedness and based upon fear of the possible consequences if he refused and Scorcia's assurances that he would not be asked to engage in any violence.  Mr. Masterjoseph insists that without those assurances he would not have participated despite his fears, and also insists that he would not have participated in violent conduct had Scorcia reneged on the assurances he had given Mr. Masterjoseph and asked him to engage in violence.[7]  There is no evidence that Mr. Masterjoseph was asked to go with Scorcia and Anthony Silvestro to a meeting with John Doe #10 twice in February 2019 for any reason other than his threatening appearance.  John Doe #10 was not confronted on either of the two occasions that Mr. Masterjoseph accompanied others to John Doe #10's house.  See PSR ¶¶ 31-34.[8]

---

[6]Although Mr. Masterjoseph has fully accepted responsibility for his conduct, acknowledging that Scorcia asked him to accompany him because his threatening appearance was intended to instill fear in John Doe #10 and #11of imminent physical violence, it should be noted that Scorcia falsely stated under oath that he did not threaten any physical violence, but only threatened economic harm to John Doe #11's reputation if he failed to repay the debt.

[7]Attached as Exhibit 1 is a letter to your Honor from Mr. Masterjoseph explaining how he came to be involved in the instant offense, providing additional details, and expressing his extreme remorse and embarrassment.

[8]If Silvestro's claim to Scorcia that subsequently Silvestro did confront "the kid" [John Doe #10] was true, see ¶ PSR 35, there is no evidence to suggest that Mr. Masterjoseph was with him.  Mr. Masterjoseph denies going with Silvestro.  It is extremely unlikely that he would have gone with Silvestro if Scorcia was not present.  He didn't even know Silvestro

Although Scorcia relied on his and the crime family's reputation for violence to intimidate John Doe #11 into making payments on his debt, the government concedes that Mr. Masterjoseph had no reputation for violence, but was asked to go along with Scorcia merely because of his physical stature, i.e., his threatening appearance. *See* September 29, 2020 Guilty Plea Transcript, at 41, Docket Entry 465.[9] The government stated its satisfaction with Mr. Masterjoseph's statement under oath during his guilty plea allocution that he did not even get out of the car when the person who had asked him to take a ride [Thomas Scorcia] met with John Doe #11. *Id.*, at 43-44.

Although Scorcia claimed to Anthony Silvestro in an intercepted telephone call on April 30, 2019, that he had hit John Doe #11, *see* PSR ¶43, there is no evidence to corroborate this claim. Scorcia stated during his guilty plea allocution that he merely threatened [economic] harm to John Doe's reputation if he failed to repay the loan. See November 25, 2020 Transcript of Thomas Scorcia Guilty Plea Allocution, at 48, Docket Entry 482. In addition, John Doe #11 has denied to law enforcement that Scorcia had assaulted him, *see* PSR ¶ 44.

Although the indictment alleges that Thomas Scorcia continued to use extortionate means to collect debts from several individuals until June 2019, there is no evidence to suggest that Mr. Masterjoseph ever accompanied Mr. Scorcia on any of these other occasions to threaten any other individuals. Mr. Masterjoseph states in his letter to your Honor (Exhibit A, at 3) that after the three occasions charged in the indictment he told Scorcia that he did not feel comfortable continuing to do this and he stopped accompanying him. The probation department acknowledges that Mr. Masterjoseph's role was limited to accompanying Scorcia on the three occasions when Scorcia hoped to intimidate Dominick Ricigliano [John Doe #10], and attempted to intimidate John Doe #11.

---

or be in Silvestro's presence other than on the two occasions he accompanied Scorcia to John Doe #10 house.

[9]It is clear that on occasion people were often brought along to a confrontation merely because of their threatening appearance when the purpose was merely to frighten someone and not to beat them up. Anthony Silvestro and Joseph Amato Jr. were overheard acknowledging this in a December 7, 2018 intercepted telephone conversation. *See* Government's Detention Memo dated October 3, 2019, at 7-8. Docket Entry 21.

Honorable Brian M. Cogan<br>
October 14, 2021<br>
Page 6

History and Characteristics of the Defendant

Mr. Masterjoseph's Personal History and Good Character

Mr. Masterjoseph is 59 years old and this is his first arrest.  He was raised by his mother and then, when he was thirteen years old, by his maternal grandmother, as his mother left the home to seek employment opportunities. His mother was only sixteen years old when she gave birth to the defendant. Mr. Masterjoseph was sixteen years old when for the first and only time he met his father.  His mother introduced them when he was playing baseball in Ossining, New York where his father lived.  Although making promises to the defendant, his father failed to follow through.  His father's abandonment and failure to keep the promises he had made caused the defendant to seek counseling.

When he was young Mr. Masterjoseph had hopes of becoming a professional baseball player.  At New Rochelle High School he played baseball and football, graduating in 1980. He attended and played baseball at Concordia College in Bronxville, NY from 1982 to 1985, dropping out just eight credits short of his bachelor's degree to pursue a career as a professional baseball player.  Although he played one summer in the Toronto Blue Jays organization, he failed to succeed professionally in baseball.

Mr. Masterjoseph's married Marie Iovine in 1988.   They had two children, Gregory and Jenna Rose.   Although the marriage ended in separation in 1995, and divorce in 1999, his former wife remains supportive.  He continued to see and support his children regularly after the divorce, attending all of their sporting events.  They remain fully supportive. Attached as Exhibit 2 is a letter from Gregory to your Honor, explaining how his father was devoted to his children, was generous to those in need, put others before himself, and instilled in him the values of proper and respectful behavior.

Attached are several additional letters for your consideration from those close to Mr. Masterjoseph, describing his character and great feelings of remorse.  A letter from Ms. Nicoletta Pellegri, Mr. Masterjoseph's aunt, attached as Exhibit 3, describes how Mr. Masterjoseph when young, in addition to playing baseball and football, always worked to help support himself, and was never in any trouble before his involvement in the instant offense.  Later, after college when he married and became a court reporter, he was devoted to his children, providing for them and coaching their many sports teams, and was always there providing support for friends and family.  Ms. Pellegri attests to the defendant's feelings of remorse and suffering as a result of losing his profession as a court reporter.

In her letter attached as Exhibit 4, Ms. Lauren Mulhare, engaged to Mr. Masterjoseph's son Gregory and soon to become the defendant's daughter in law, states that knowing Mr. Masterjoseph for nine years, and her receiving her BA in psychology, makes her able to accurately speak to his moral character.  She describes him as a wonderful man and father, generous with others, with a strong sense of duty to his job, family, and community, and possessing a great deal of integrity.

Finally, in a letter attached as Exhibit 5, Ms. Catherine Esposito, Mr. Masterjoseph's mother, describes how, given her and her husband's age and poor health, she is totally dependent on Mr. Masterjoseph relying on him to take her to medical appointments and to the hospital when necessary.  She corroborates the other letters as to her son's good character, his having had no disciplinary issues growing up, his working after school and on weekends, and his being respectful towards his teachers, coaches, family and the law, and his being a hardworking parent who coached his children's teams to keep them heading in the right direction.  Her son has expressed to her his being very sorry and embarrassed for his participation in the instant offense.

In her letter, she described the diagnosis of CTE (chronic traumatic encephalopathy) her son has received.  Mr. Masterjoseph has advised that he received this diagnosis[10] eight or nine years ago.  His current symptoms include severe memory loss, difficulty thinking (cognitive impairment), difficulty planning, organizing, and carrying out tasks (executive function).  According to ¶ 130 of the PSR, Mr. Masterjoseph's son Gregory speculates that his father suffers from CTE as a result of suffering numerous concussions playing football.  Mr. Masterjoseph recalls several concussions:  one when he was hit by a car when he was only five;  at least two and perhaps several more while playing football in high school; and at least two and perhaps several more while participating in mixed martial arts as an adult.

Mr. Masterjoseph's Long Consistent Employment History

After working during and after college for several years at various jobs (see PSR ¶¶ 144-45), he attended court stenography school and became a freelance court stenographer. He then worked as an independent contractor, primarily taking depositions, for approximately 30 years, from October 1990 through March 2020, through Deitz Lexitas Court Reporting, Brooklyn, NY,.  Although the COVID-19 pandemic was the immediate reason for his no

---

[10]As a definitive diagnosis can only be done by autopsy, such diagnosis can only have been provisional.

longer working as a court stenographer, his felony conviction in this case will in all likelihood make it impossible for him to continue working as a court stenographer, as taking depositions requires that he continue to be a licensed notary public, a license that he has been unable to renew because of his felony conviction in this case.

As noted in the PSR, at ¶ 141, Mr. Masterjoseph has been employed at Amazon in Staten Island since September 2020.  Last week he sent me documentation verifying that he was to be promoted effective October 10, 2021, to the position of "Seasonal Process Assistant."  He advised that he will be managing 50 employees moving stock at the Amazon warehouse.  He just advised me that the promotion went through, and he is now a supervisor.

Conclusion

For all the above reasons, it is respectfully submitted that a sentence of probation (or "time served" followed by a term of supervised release), would be sufficient to achieve the goals of sentencing spelled out in 18 U.S.C. § 3553(a)(2), and is therefore warranted.

Respectfully yours,

 /s/ David Gordon
David Gordon

cc:    Elizabeth Geddes, Esq.
       Assistant United States Attorney (by ECF)

       Patricia Sullivan, Senior United States Probation Officer (by Email)