Case 1:19-cr-00442-BMC  Document 648  Filed 10/21/21  Page 1 of 6 PageID #: 4765



U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EAG
F. #2018R01021

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 21, 2021

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Albert Masterjoseph</u>
              <u>Criminal Docket No. 19-442 (S-1) (BMC)</u>

Dear Judge Cogan:

      The government respectfully submits this letter in connection with the sentencing of defendant Albert Masterjoseph and in response to the defendant's October 14, 2021 sentencing memorandum (the "Defendant's Memo"), which includes his objections to the March 5, 2021 Pre-Sentence Investigation Report ("PSR").

## BACKGROUND

      Prior to their arrests in October 2019, co-defendant Thomas Scorcia and John Doe #10 both operated lucrative loansharking businesses. In or about 2017, John Doe #10 became upset that Scorcia was operating the business in locations that John Doe #10 viewed as his turf. John Doe #10 went to Scorcia's office in Brooklyn, New York, where he assaulted Scorcia and vandalized his property, and then directed several of Scorcia's loansharking customers to stop paying Scorcia and instead only make payments to John Doe #10.

      In or about January 2019, Scorcia decided to retaliate. This decision coincided with Scorcia's formal induction into the Colombo organized crime family of La Cosa Nostra (the "Colombo family") in December 2018. Scorcia enlisted several of his codefendants for assistance, including the defendant Albert Masterjoseph and co-defendants Krenar Suka and Anthony Silvestro. He also expressly sought and received the approval of Joseph Amato, a powerful captain in the Colombo family, to whom Scorcia reported.

  First, on Wednesday, January 30, 2019, Scorcia directed one of their common loansharking customers to tell John Doe #10 that he was to no longer make payments to John Doe #10. On the evening of January 30, 2019, Scorcia and Suka went to the Woodrow Diner in Staten Island where they planned to confront John Doe #10. At 8:06 p.m. (TS2 #1442), Scorcia and Suka called Silvestro and complained that the Woodrow Diner was packed and they were concerned about carrying out the planned confrontation. For example, Silvestro proposed, "I would just wait for the kid to come out the place and grab him before he gets to the car," but Suka said, "It's packed bro, there's so many cars there, there's so many people there. … Bro, I'm telling you, Tommy [Scorcia], tell him it's fucking slammed in there right now." Scorcia echoed, "Fucking packed, people walking out with fucking kids, and like (UI[1]) fucking (UI)." Scorcia then lamented, "I'm fucking, I'm sick to my fucking stomach, I was just gonna walk right in there, but there's fucking people coming out with fucking families." As an alternative, Scorcia offered, "Horrible, he's gonna have to fucking text him, because he text him and say 'Hey I want to meet you we're gonna do something here and there or whatever' and bingo (UI) fucking pop up like that maybe tomorrow afternoon or Saturday morning." A few minutes later, at 8:37 p.m. (TS2 #1447), after Scorcia and Suka had apparently left the dinner, Scorcia and Silvestro spoke again.

| | |
|---|---|
| Scorcia: | It's a breakfast place, I get in, I'm about to get in the car I said, "fuck it, I'm gonna go in there right now." |
| Silvestro: | And this rat really parked under the fucking cameras? |
| Scorcia: | Yeah, 150%, I said, "I'm gonna go in there right now, and walk in, I'm gonna blast the kid in the face." I says, "motherfucker." |
| Silvestro: | Yeah, yeah, yeah. |
| Scorcia: | The mother fucker, the place is packed, (UI). |
| Silvestro: | Listen, at the end of the day, you can't, fucking, cannot jeopardize the freedom for fucking some little jerkoff like that you know what I mean. |

They then started to make plans for their next attempt to extort John Doe #10. Silvestro said:

> On Saturday [February 2, 2019], we shouldn't even, we shouldn't even make it a fucking song and a dance, we jump out. … Give him (UI) you send him a smack. If he raises his hand back to you, we beat the bricks off him, that's it. …That's the bottom line, we're taking his shit, you're giving him your fucking, breaking his shit, punching him and we're out of there.

---

[1] "UI" is an abbreviation for "unintelligible."

Scorcia answered, "Exactly. That's what we're gonna do." They agreed to execute the plan on Saturday. Scorcia also updated co-defendant and fellow soldier Daniel Capaldo about what had happened:

> Nothing, I just pulled into Woodrow or whatever, I'm gonna head home, I'm gonna head home, and uh, it just didn't work, wasn't good to fucking do the work, you know what I'm saying? Not enough time, whatever, the valves wouldn't hold, lot of fucking people, too many people complaining they would have had no water, so it would have been really, uh, fucked up.
>
> \*\*\*
>
> You know, one of the big plumbers that I had with me, not the one you know, the other one, he didn't like it. You know, so, what the fuck was I gonna do? You know? Abort the job? What would we do? We'd have to do OT on the whatever. All right, I'll talk to you tomorrow then. No worries, all good.

Scorcia, Silvestro, and Masterjoseph attempted to carry out the plan, a second time, on the following Saturday, February 2, 2019, but the plan was thwarted when they went to John Doe #10's residence and discovered he had had cameras installed that could capture their actions on a recording. At 1:15 p.m. (TS2 #2066), Scorcia called Capaldo and asked him to put Amato on the line, after which they discussed the extortion scheme in coded language referring to purported plumbing work:

| | |
|---|---|
| Scorcia: | Oh, alright. So, hear, hear me out, the whatchamacallit, the guy that we have to do the job, off the job for, run all the lines and everything, doesn't uh, was avoiding the kid, doesn't want to meet, doesn't want to start the work, the only way he would meet the kid, to do what they have to do, would be in front of his house. |
| Amato: | They would only meet in front of his house? |
| Scorcia: | Yeah, where he's got, uh, cameras all over it. |
| Amato: | Yeah, alright, stupid, don't worry, don't go over his house, that's for sure, Cuz. |
| Scorcia: | Don't, right? |
| Amato: | No, no, you control the situation. Don't let him control it. |
| Scorcia: | Yeah. |
| Amato: | Alright, just leave it alone, leave it until tomorrow, we'll talk, alright. |

A few minutes later, at 1:27 p.m. (TS2 #2069), Scorcia related to Suka that Amato had told him to abort the plan: "I just, uh, tried to get permission over there." Scorcia then observed, "That's ridiculous over there by the house. I don't know, but he's [referring to John Doe #10] fucking, (UI) chicken shit, he's got no balls, he's a telephone tough guy, you know that, you know."

3

On Tuesday, February 5, 2019, Scorcia, Silvestro and Suka tried again to carry out their plan to confront and assault John Doe #10. In a call at 12:44 p.m. (TS2 #2477), Scorcia told Silvestro, "Just give me a heads up what time, ya know, this way I can get the other gorilla to come and meet us, from the other day. … Five, 6:00 (UI) later, you tell m-, ya know, what do you think? Wanna get a little darker? Right? … We could do it right in New Dorp too 'cause that's where that kid lives." Law enforcement then warned John Doe #10 about the potential assault and John Doe #10 communicated that he had been warned to others, causing Scorcia and others to abandon their plan that night.

Notwithstanding law enforcement scrutiny, Silvestro followed through with some form of their plan after all, as evidenced by a call on February 8, 2019, at 1:33 p.m. (TS2 #2987), wherein Silvestro told Scorcia that he had instilled fear in "the kid," an apparent reference to John Doe #10:

> Silvestro: I've got the funniest fucking video to show you when I see you. You're gonna pee your pants.
> Scorcia: Fuck! I spoke to my buddy, he says he'll let me know, so hopefully it won't be fucking dead. He's fucking scared, this fucking kid. You don't think so?
> Silvestro: Bro, you have no idea what I did to him.
> Scorcia: Motherfucker! Why can't I be there!?!? Motherfucker! (Laughing) Motherfucker.

## DISCUSSION

I.  Masterjoseph Was an Associate of the Colombo Crime Family

Counsel objects to the characterization of Masterjoseph as an associate of the Colombo family and the inclusion of information in the PSR regarding the structure, means and methods of La Cosa Nostra. As described in more detail below, although Masterjoseph did not play a significant role in the Colombo family or did not appear to associate with others within the Colombo family, the information about La Cosa Nostra and his limited association is both accurate and relevant to sentencing Masterjoseph. This information is therefore properly included in the PSR.

As described above, Scorcia was inducted into the Colombo crime family in December 2018 and once he became a full-fledged soldier, Scorcia immediately decided to retaliate against John Doe #10. To do so, he gathered several associates to assist him with carrying out the planned extortion. Among those associates was Masterjoseph. In sum, at least for a period of time, Masterjoseph was an associate of Scorcia and the Colombo family. Furthermore, the information regarding the structure, means and methods of La Cosa Nostra is relevant to the charged conduct. Indeed, La Cosa Nostra and Scorcia's role in it are the very reasons Scorcia's loansharking businesses thrived and he and his coconspirators, including Masterjoseph, were able to even attempt to carry out the extortion of John Doe #10. In fact, loansharks and their associates, like Scorcia and Masterjoseph, rely on La Cosa Nostra's proven history of committing acts of violence in inducing their victims to pay

4

extortionate rates of interest. Moreover, the inclusion of information regarding La Cosa Nostra is appropriate because Scorcia expressly sought and received permission and counsel from Amato, a captain, and the individual to whom Scorcia reported in the Colombo family.

II.    Analysis

The government respectfully submits that the sentence should reflect the nature and characteristics of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

    A.    Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

    B.    Application

The defendant has been convicted of an offense involving threats of violence to interfere with a loansharking business operated by John Doe #10. Using threats of violence is a serious crime. See 18 U.S.C. § 3553(a)(1). The intercepted communications demonstrate that the defendant and his coconspirators engaged in a combined effort to intimidate John Doe #10 and abandoned their plan only after they believed they would be caught by law enforcement. While the conduct was no doubt serious, the government acknowledges that the defendant's participation in the offense was limited, that the defendant appeared to lack any role in decision-making and that his role in the offense was a result of a loansharking debt he owed to Scorcia.

## CONCLUSION

In this case, given all of the facts and circumstances discussed above, the sentence should be fashioned to achieve the purposes set forth in 18 U.S.C. § 3553(a).

                Respectfully submitted,

                BREON PEACE
                United States Attorney

By:   /s/_____
       Elizabeth Geddes
       Megan Farrell
       Assistant U.S. Attorneys
       (718) 254-7000

Cc:    Clerk of the Court (BMC) (by ECF)
       Patricia Sullivan (U.S. Probation) (by e-mail)
       David Gordon, Esq. (by ECF)